UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION

Action Pending in:
United States District Court, Southern District of New York (11-md-02293-DLC)

Case No.

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA DUCES TECUM

**NOTED FOR CONSIDERATION:**
**FRIDAY, OCTOBER 5, 2012**

I, MICHAEL E. KIPLING, do hereby declare:

1.      I am counsel for Amazon.com ("Amazon"), the moving party in this proceeding.

2.      On July 6, 2012, in connection with several lawsuits pending in the United States District Court for the Southern District of New York ("the Litigation"), this Court, at the request of Defendant Apple, issued a subpoena *duces tecum* to non-party Amazon ("the Subpoena").  A true and correct copy of that Subpoena is attached hereto as Exhibit A.

3.      I have reviewed the transcript of a case management conference in the Litigation held on June 22, 2012.  A true and correct copy of the cover page and relevant pages from that transcript are attached hereto as Exhibit B.

4.      Prior to filing their complaints in the Litigation, the Department of Justice and the Texas Attorney General conducted lengthy formal investigations into the pricing of eBooks; the

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 1

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

State of Connecticut also investigated eBook pricing. In connection with these investigations, this firm represented Amazon and I was personally involved in Amazon's response to three different Civil Investigative Demands ("CIDs"), as well as to other more targeted discovery requests from the regulators.

5. In addition to responding to the CIDs, Amazon responded to inquiries from the United Kingdom's Office of Fair Trading and the European Commission in conjunction with their investigations of the same companies that are defendants in the Litigation regarding price-fixing of eBooks in Europe.

6. In response to the CIDs, Amazon's attorneys interviewed Amazon employees, collected, reviewed and produced thousands of documents, and responded to repeated requests for highly sensitive data. This effort was quite expensive, costing Amazon hundreds of thousands of dollars in legal fees and fees to the outside vendor we retained to process, search and redact the electronically stored information. These costs relate solely to our response to the U.S. investigations and do not include the costs of responding to the European investigations, which were also significant.

7. The material already produced by Amazon in connection with the government investigations includes the most sensitive, high-level planning documents regarding Amazon's eBook business; a massive amount of extremely sensitive, anonymized data regarding Amazon's sales of eBooks and physical books; non-privileged documents relating to Amazon's negotiations and communications with the Publishers who are defendants in the Litigation; and other confidential, internal documents relating to the impact of the conspiracy on Amazon.

8. It is my understanding that in late June 2012 the DOJ produced all of the documents and data it had gathered during its investigation, including the Amazon documents and data, to Apple and the other parties in the Litigation. I understand that the state Attorneys General have since produced all documents they received from Amazon that were not included

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 2

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

in the DOJ production. As a result, Apple and the other Defendants have the benefit of the earlier document and data production.

9.      The July 2012 Subpoena from Apple is enormously broad in its scope, both as to the documents and the data it requests. *See* Exhibit A. The subpoena duplicates many of the requests that the CIDs already covered, but also adds requests for new types of documents and data, many of which, in my opinion, have little to no relevance to the issues in the Litigation, which Judge Cote has described as "a straightforward, horizontal price-fixing conspiracy[.]" *United States v. Apple, Inc.*, 2012 U.S. Dist. LEXIS 127034, *20 (S.D.N.Y. Sept. 5, 2012).

10.      Shortly after receiving the Subpoena from Apple, I began to negotiate with Apple's counsel, during which time it became clear that Apple had not even reviewed the prior production before serving the Subpoena, because they asked us for information that was in our earlier production. Although we pointed out to Apple's counsel that much of the key data and the significant documents covered by their subpoena, including the documents from the time period when the conspiracy was formed, had already been produced to DOJ and ultimately to the Defendants, Apple nonetheless insisted that Amazon's earlier production was inadequate and that Amazon would have to repeat its search for responsive documents. Apple insists that Amazon review again the same universe of documents that we reviewed before and found to be non-responsive to the CIDs.

11.      Amazon timely served objections to the Subpoena on July 20, 2012.

12.      Notwithstanding its view that the earlier production of documents and data should suffice, Amazon participated in a lengthy negotiation with Apple regarding compliance with the subpoena. I certify that these negotiations complied with any obligations of Amazon pursuant to Fed. R. Civ. P. 37(a)(1). As a result of the meet-and-confer process, Amazon conditionally agreed to supplement its earlier production by providing numerous additional categories of documents and data including:

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 3

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

- Detailed (anonymous) data on a per-transaction level data *regarding every eBook sale since the launch of the Kindle store in November 2007*;
- Similar data for sales of physical books;
- Non-privileged documents from the files of the key custodians (Russ Grandinetti, Steve Kessel, David Naggar, Laura Porco) regarding communications and negotiations with the Publisher Defendants and the impact of the conspiracy on Amazon;
- Copies of all agency agreements between Amazon and any publisher, and any communications with publishers regarding agency;
- Copies of any communications between Amazon and any regulator regarding the conspiracy challenged in the Litigation;
- Any communications with publishers found in the files of Amazon's CEO, Jeff Bezos; and
- Copies of all non-privileged documents produced to the European Commission (which production includes all materials produced to the UK's Office of Fair Trading).

These commitments by Amazon were conditioned upon Apple's agreement to reimburse Amazon for the costs of complying with this Subpoena, as required by FRCP 45, including its outside counsel and vendor costs but excluding the cost associated with Amazon's employees or in-house attorneys.

13. The volume of the data that Amazon has agreed to produce is enormous. I have been informed that other eBook retailers have also been asked to produce transaction-level data. If the other retailers provide the same level of data that Amazon is willing to provide, the parties will be in the remarkable position of having an anonymous record of every eBook that has ever been purchased in the United States, through the date the underlying litigation commenced. I have been involved in antitrust litigation for 35 years and I do not recall any case before this when the parties had access to such comprehensive data. This data alone should be more than sufficient for the parties and their experts to prepare their claims or defenses. I note that the expert for the Plaintiff States in the underlying litigation was able to analyze the effects of the conspiracy and provide evidence to the Court with data alone, and the data to which he had access is less complete than Amazon has now agreed to provide. *See* Mem. In Supp. of Plf.

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 4

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

States' Mot. for Prelim. Approval of Settlements, Appendix E (S.D.N.Y. No. 12-cv-6625, docket no. 11, att. 6. (Relevant pages are attached as Exhibit C).

14. Because of the sensitivity of the materials that Apple is seeking in the Subpoena, and the requirements of the Protective Order in the Litigation, Amazon will incur substantial legal fees prior to production in order to review documents, determine whether they are responsive or privileged, and determine the need for (and the level of) confidentiality as to each responsive, non-privileged document. The cost of complying with this Subpoena *in the manner to which Amazon has conditionally agreed* might exceed the cost of complying with the three CIDs discussed above, because the scope of the subpoena is greater, the time period covered is longer and the search terms are more onerous. Based on our prior experience, *complying with Apple's demands* as to the subpoena would likely cost Amazon several times more.

15. On July 25, 2012 Amazon was served with another subpoena *duces tecum*, issued by the Class Plaintiffs in the underlying litigation on behalf of all Plaintiffs (i.e, DOJ, State Attorneys General). That Subpoena overlaps Apple's Subpoena, but it is significantly less burdensome and Plaintiffs—to date—have been more reasonable in working to mitigate the burden on Amazon. We have made it clear to all parties from the outset that Amazon will ultimately conduct only one search for ESI in order to respond to both Subpoenas. Based on our negotiations to date, I believe that the Proposed Order we are submitting with this Motion will go a long way towards satisfying the Plaintiffs' requests and Amazon continues to negotiate with the Plaintiffs, notwithstanding the filing of this Motion, regarding any additional materials Plaintiffs feel they need from Amazon.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED at Seattle, Washington this 14th day of September 2012.

s/ Michael E. Kipling , WSBA #7677
Michael E. Kipling

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 5

## CERTIFICATE OF SERVICE

I do hereby certify that on this 14th day of September, 2012, I caused to be served a true and correct copy of the foregoing *Declaration of Michael E. Kipling in Support of Motion to Quash or Modify Subpoena Duces Tecum* by method indicated below and addressed to the following:

Christopher Wells
Lane Powell PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101
Telephone: (206) 223-7084
Email: wellsc@lanepowell.com

*Delivery Via:*
[  ] U.S. Mail
[  ] Overnight Mail
[  ] Facsimile
[  ] Hand Delivery
[ X ] E-Mail Only
[  ] CM/ECF

Andrew Frackman
Edward N. Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 728-5671
Email: afrackman@omm.com
Email: emoss@omm.com

*Delivery Via:*
[  ] U.S. Mail
[  ] Overnight Mail
[  ] Facsimile
[  ] Hand Delivery
[ X ] E-Mail Only
[  ] CM/ECF

DATED this 14th day of September, 2012.

s/ Michael E. Kipling
Michael E. Kipling, WSBA #7677
Marjorie A. Walter, WSBA #40078
KIPLING LAW GROUP PLLC
3601 Fremont Avenue N., Suite 414
Seattle, WA 98103
206.545.0345
206.545.0350 (fax)
E-mail: kipling@kiplinglawgroup.com

*Counsel for Amazon.com, Inc.*

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 6

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

# Exhibit A

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| United States | ) | |
| *Plaintiff* | ) | Civil Action No.   12-cv-02826 (DLC) |
| v. | ) | |
| Apple Inc., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Southern District of New York            ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Amazon.com, Inc.
   c/o Michael Kipling, Esq. Kipling Law Group 3601 Fremont Ave. North, Suite 414 Seattle, WA  98103

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Exhibit A.

| Place:  Lane Powell PC<br>        1420 Fifth Avenue, Suite 4100<br>        Seattle, WA  98101  / Attn:  Christopher Wells, Esq. | Date and Time:<br><br>        08/06/2012 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___07/06/2012___

| *CLERK OF COURT* | | OR | *C Bhlell* |
|---|---|---|---|
| _____ | | | _____ |
| *Signature of Clerk or Deputy Clerk* | | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Apple Inc.    
_____, who issues or requests this subpoena, are:

Christopher Wells, Esq., Lane Powell PC, 1420 Fifth Avenue, Suite 4100, Seattle, WA  98101
(206) 223-7084, wellsc@lanepowell.com

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 8

Civil Action No. 12-cv-02826 (DLC)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*  Amazon.com, Inc. _____

was received by me on *(date)* _____.

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 12-cv-02826 (DLC) |
| APPLE INC., et al. | ) ) | |
| Defendants. | ) ) ) | |

|  |  |  |
|---|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | ) ) ) ) ) | Civil Action No.: 11-md-02293 (DLC) |
| This document relates to: | ) ) | CLASS ACTION |
| ALL ACTIONS | ) ) ) | |

|  |  |  |
|---|---|---|
| THE STATE OF TEXAS; THE STATE OF CONNECTICUT; et al. | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No.: 12-cv-03394 (DLC) |
| v. | ) ) | |
| PENGUIN GROUP (USA) INC., et al., | ) ) ) | |
| Defendants. | ) | |

**EXHIBIT A TO SUBPOENA TO AMAZON.COM, INC.**

**DEFENDANTS' REQUESTS FOR DOCUMENTS**

1.      All documents provided by You to the DOJ or received by You from the DOJ and all communications between You and the DOJ, and any documents relating to those communications, whether or not in response to a formal demand or request, in connection with (i) the Investigation, (ii) any other inquiry related to eBooks or physical books, (iii) Apple, (iv) the DOJ Litigation, or (v) any settlement or proposed settlement of the DOJ Litigation.

2.      All documents and communications relating to the impact of (i) the DOJ Litigation, (ii) the proposed settlement of the DOJ Litigation, or (iii) the Class Action Litigation on Your business and/or the market for eBooks.

3.      All documents provided by You to any Regulator or received by You from any Regulator and all communications between You and any Regulator, and any documents relating to those communications, relating to (i) eBooks or physical books or (ii) Apple, including but not limited to documents and communications relating to investigations or lawsuits filed by any state Attorney General relating to eBooks.

4.      All documents and communications relating to Your pricing of eBooks and eReaders, including without limitation (i) price lists, (ii) pricing plans, (iii) pricing policies, (iv) pricing forecasts, (v) pricing strategies, (vi) pricing analyses, and (vii) pricing algorithms.

5.      All documents concerning Your consideration of or decision to price eBooks below Your wholesale acquisition cost, including without limitation documents relating to (i) Your determination of which titles to price below cost, (ii) the amount of your negative gross margins on such titles, (iii) the actual or potential impact of pricing titles below cost on your business (including businesses other than Your book business), including without limitation any associated potential revenues, profits, and other benefits, (iv) the accounting provision for such losses, (v) the effects of below-cost pricing on the products priced below cost and on competitors, (vi) documents sufficient to show Your losses from below-cost pricing on quarterly

basis, (vii) alternatives to below-cost pricing, and (vii) documents sufficient to show how You used the funds that previously were used to fund below-cost pricing.

6.     All documents and communications relating to Your pricing of physical books, including without limitation (i) price lists, (ii) pricing plans, (iii) pricing policies, (iv) pricing forecasts, (v) pricing strategies, (vi) pricing analyses, (vii) pricing algorithms, and (viii) documents concerning the pricing of physical books or books in any other format that relate to, mention, analyze, or discuss the pricing of eBooks.

7.     All documents and communications relating to Your pricing algorithms, including documents sufficient to understand (i) how frequently You changed Your pricing and (ii) whether the changes were input by human decision-making or were automated.

8.     All documents and communications relating to co-op funding or any other type of promotional support for eBooks.

9.     All agreements between You and the Publishers or any other publisher relating to the purchase, sale, or distribution of eBooks which were in effect prior to the implementation of any Agency Model contracts (and drafts thereof) between You and the Publishers.

10.     All documents and communications relating to Your negotiations with the Publishers or any other publisher relating to the implementation of an Agency Model for the purchase, sale, or distribution of eBooks, including without limitation any Agency Model contracts (and drafts thereof) between You and the Publishers or any other publisher.

11.     All documents and communications relating to the actual or potential use of minimum prices or price tiers in connection with the purchase, sale, or distribution of eBooks.

12.     All documents and communications relating to Your threatened or actual refusal to deal with any of the Publishers or any other publisher who proposed or suggested the Agency Model for the purchase, sale, or distribution of eBooks.

13.     All documents and communications concerning your decision to use the Agency Model for the purchase, sale, or distribution of eBooks.

14.     All documents provided by You to Random House or received by You from Random House relating to the Investigation.

15.     All communications between You and Random House relating to the Investigation, Apple, or to any other publisher, and all documents relating to those communications.

16.     All communications between You and Random House, to the extent not already provided, relating to any decision, discussion, or negotiation with respect to Amazon's distribution of Random House books on an Agency Model or any other business model.

17.     All communications between You and any of the Publishers or any other publisher relating to Apple's entry into the eBook or eReader market or Apple's eBook or eReader business after such entry, and all documents relating to those communications.

18.     All documents and communications relating to Apple's iPad, iBooks, or iBookstore, including without limitation Apple's actual or potential entry into the eBook market.

19.     All documents and communications relating to Your withholding of marketing, promotion, advertising, or distribution of the Publishers' titles or any other publishers' titles.

20.     All documents and communications relating to actual or potential windowing of eBooks by the Publishers.

21.     All documents and communications relating to Your plans for eBooks and eReaders, including without limitation business plans, short term and long-range strategies and objectives; pricing strategies; budgets and financial projections; expansion or retrenchment plans; research and development efforts; and presentations to management committees, executive committees, and boards of directors.

22.     All strategy documents concerning the relationship between Your eBook businesses and Your businesses relating to physical books and book publishing (including the actual or potential publishing of both physical books and eBooks), including without limitation documents concerning the relationship of those businesses with respect to pricing.

4

23.    All documents and communications relating to the relationship between the pricing of eBooks and the pricing of the Kindle.

24.    All documents and communications, including without limitation market studies, forecasts, and surveys, relating to (i) the relationship between Your pricing of eBooks and/or physical books and the sales of other products sold by You, including the Kindle, or (ii) the relationship between Your pricing of eBooks and/or physical books and the sales of other products sold by other retailers, including eReaders.

25.    All documents and communications, including without limitation market studies, forecasts and surveys, relating to (i) the relationship between Your sales of eBooks and eReaders and the prices of other products sold by You, or (ii) the relationship between Your sales of eBooks and eReaders and the prices of other products sold by other retailers.

26.    All documents and communications, including without limitation market studies, forecasts, and surveys, relating to Amazon's $9.99 pricing of certain eBooks (including without limitation those whose titles appear(ed) on the *New York Times* bestseller list) and: (i) the sales of physical copies of such books, (ii) the timing of sales of such titles, whether as an eBook or a physical book, and (iii) the total number of sales of such titles, whether as an eBook or as a physical book.

27.    All documents relating to actual or potential competition in the sale of eBooks or eReaders, including without limitation market studies, forecasts and surveys, and all other documents relating to (i) Your market share or Your competitive position, (ii) the market share of any other company engaged in the sale of eBooks or eReaders, (iii) the share of any book publisher in the market relating to book publishing (whether relating to the publishing of physical books or eBooks), (iv) the relative strength or weakness of any other companies engaged in the sale of eBooks or eReaders, (v) supply and demand conditions, (vi) Your attempts to win customers from other eBook or eReader sellers and the losses of Your customers to other eBook or eReader sellers, (vii) the prices at which other sellers sell eBooks or eReaders, (viii) the margins earned by You or any other eBook or eReader seller, (ix) any actual or potential effect

on the supply, demand, cost, or price of eBooks or eReaders as a result of competition from any other eBook or eReader seller, (x) any actual or potential effect on the supply, demand, cost, or price of eBooks as a result of competition from physical books, (xi) actual or potential competitors, including but not limited to Apple and Barnes & Noble, and (xii) the actual or potential impact on eBook competition or competitors of Your businesses relating to physical books and book publishing (including the actual or potential publishing of both physical books and eBooks).

28.    All documents and communications relating to any projections of growth in the sales of eBooks, physical books, or eReaders including those offered by Amazon (the Kindle), Apple (the iPad), and Barnes & Noble (the Nook).

29.    All documents and communications, including without limitation market studies, forecasts, and surveys, relating to Your projection of how the eBook or eReader markets might evolve, including without limitation Your expectations relating to revenues, prices, market shares, margins, the potential entry or exit of other companies from such markets, and the business strategies of such companies.

30.    All documents and communications relating to Your sales, revenues, budgets, profits, gains, costs, losses, or margins relating to eBooks or the Kindle.

31.    All documents and communications relating to Your actual or potential plans to publish eBooks, including without limitation documents and communications relating to Kindle Digital Publishing (KDP) and Amazon's use of Exclusives.

32.    All documents and communications relating to pricing MFNs, content MFNs, or any other type of MFNs related to eBooks or physical books.

33.    All documents and communications relating to the Agency Model as it relates to Amazon's publishing business, including but not limited to agreements using the Agency Model.

34.    All documents and communications relating to complaints You made to any book publisher relating to any violation of the contract terms of any agreement for the purchase, sale,

6

or distribution of eBooks entered into between You and any publisher, including without limitation violations relating to pricing MFNs, content MFNs or any other type of MFNs.

35.     All documents and communications relating to analyses of the strengths or weaknesses, pricing, market, and functionality of any devices used to read eBooks, including but not limited to devices offered by Amazon (the Kindle), Apple (the iPad), and Barnes & Noble (the Nook).

36.     All documents and communications relating to file formats for eBooks, including without limitation Your consideration of and decision to (i) use a proprietary eBook format or (ii) not support the ePub format.

37.     All communications with lawyers representing plaintiffs in the Class Action Litigation, and any documents relating to those communications.

38.     All consumer research or surveys, focus group studies (either internal or third party) relating to consumer usage or purchasing patterns for books (eBooks and/or physical books) or eReaders.

39.     Any documents or studies relating to the extent to which consumers browse in brick-and-mortar stores and/or purchase books (either eBooks or physical) on-line.

40.     Any documents relating to consumer usage of the Amazon book price check applications for mobile phones.

41.     A useable copy of each electronic or other database or data set used or maintained by the company that contains information relating to the company's ebook distribution, including: (a) products and product codes; (b) sales; (c) list prices; (d) retail prices; (e) dates associated with list prices and retail prices; (f) marketing and promotions; (g) margins; (h) costs, including production costs, distribution costs, standard costs, expected costs, and opportunity costs; (i) patents or other intellectual property; (j) research or development projects; or (k) customers, including any accompanying data dictionary, and any software product or platform required to access the database or data set.

7

42.     For each database or data set that contains cost or margin information, one copy of each regularly produced (no more frequently than in four week periods) report generated using that database and any documentation that defines, describes, or explains the calculation in any terms, measures, or aggregations appearing on the materials provided.

43.     Sales data and metadata for books, including:

(a)     all identifiers of the eBook and equivalent print versions of the book (*e.g.*, SKU, ISBN);

(b)     name of the author;

(c)     title of the eBook;

(d)     name of the eBook's publisher and imprint;

(e)     release date of the eBook and, if different, of all print versions of the book (*e.g.*, hardcover print, trade paperback print, mass market print);

(f)     genre categorization and any other identifier that describes the form, style, attributes, or subject matter of the eBook;

(g)     wholesale price on a daily basis (net of all discounts, rebates received);

(h)     retail price on a daily basis (for all eBook titles sold on agency model, retail price set by publisher, actual price at which sold (if different), commission rate, and commission payment);

(i)     digital list price on a daily basis;

(j)     the date on which Amazon began selling the book on the Agency Model (or by publisher);

(k)     dollar and unit sales on a daily basis;

(l)     dollar and unit pre-sales of the eBook on a daily basis;

(m)     list price(s) of all equivalent print versions of the book on a daily basis;

(n)     retail price, wholesale price, and dollar and unit sales of all print versions of the book on a daily basis;

8

(o)     retail price, wholesale price, and dollar and unit sales for any pre-sales of all print versions of the book on a daily basis;

(p)     any algorithms or other computer programs used to determine retail prices of any version of the book (eBook or physical book);

(q)     whether the title was on the *New York Times* best seller list, and if so, during what time period;

(r)     cost data detailing all costs associated with selling particular the title, including joint costs for physical and e-books and costs specific to format;

(s)     any available information regarding any form of promotional support, including agreements with publishers for favorable placement on Amazon.com or Kindle web-site;

(t)     any exclusive content or special promotions of the eBook on a daily basis;

(u)     type and placement of promotion of the eBook on a daily basis;

(v)     success of each promotion of the eBook on a daily basis, including number of clicks on each promotion and number of sales made through clicks of each promotion;

(w)     any exclusive content or special promotions of equivalent print versions of the book on a daily basis;

(x)     type and placement of promotion of equivalent print versions of the book on a daily basis; and

(y)     success of each promotion of equivalent print versions of the book on a daily basis, including number of clicks on each promotion and number of sales made through clicks of each promotion.

### DEFINITIONS AND INSTRUCTIONS

Unless the context indicates otherwise, the following definitions and instructions shall apply to these requests:

9

1. "Person" means any natural person, corporation, association, organization, firm, company, partnership, joint venture, trust, estate, or other legal or governmental entity (*e.g.*, the U.S. Department of Justice, etc.), whether or not possessing a separate juristic existence.

2. "You" or "yours" means Amazon.com, Inc., and any of its parents, subsidiaries, affiliates, partners, directors, shareholders, officers, employees, agents, assigns or any predecessors or successors in interest, or any person or entity over which Amazon.com, Inc. exercises control, or who exercises control over, or is in common control with them.

3. "All" includes the term "each," or "any," and vice versa. The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa, such that each document request calls for the production of the greatest number of documents.

4. The terms "and" and "or" shall be construed conjunctively or disjunctively to bring within the scope of these requests any and all information which might otherwise be construed as outside their scope. The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; and the use of any tense of any verb shall be considered to include also within its meaning all other tenses of the verb so used.

5. "Refer" or "relate" or "referring" or "relating" means constitute, comprise, reflect, concern, regard, record, memorialize, embody, discuss, describe, evaluate, consider, review, or report on the subject matter of the document request and also refers to documents reviewed in conjunction with, or created, generated, or maintained as a result of the subject matter of the request.

6. "The DOJ" means the United States Department of Justice, individually, its employees, Commissioners, attorneys, accountants, economists, staff, consultants, experts, agents and representatives, and specifically includes any third-party representative or agent, wherever located, acting or purporting to act on its behalf.

7. "Regulator" means any federal or state governmental agency, including without limitation the DOJ, the Federal Trade Commission, any state Attorney General, any member of

10

the United States Congress, the European Commission, the United Kingdom's Office of Fair Trade, or any European Union member state competition agency, individually or collectively, and their employees, Commissioners, attorneys, accountants, economists, staff, consultants, experts, agents and representatives, and specifically includes any third-party representative or agent, wherever located, acting or purporting to act on their behalf.

8.     "Apple" means Apple Inc. its parents, subsidiaries, affiliates, partners, directors, shareholders, officers, employees, agents, assigns or any predecessors or successors in interest, or any person or entity over which Apple Inc. exercises control, or who exercises control over, or is in common control with them.

9.     "The Publishers" means

- Hachette Book Group, Inc.,
- HarperCollins Publishers L.L.C.,
- Verlagsgruppe Georg Von Holtzbrinck GMBH,
- Holtzbrinck Publishers, LLC d/b/a Macmillan,
- The Penguin Group, a Division of Pearson PLC,
- Penguin Group (USA), Inc.,
- Simon & Schuster, Inc., and
- Random House, Inc.

individually or collectively, and their parents, subsidiaries, affiliates partners, directors, shareholders, officers, employees, agents, assigns or any predecessors or successors in interest, or any person or entity over which they exercise control, or who exercises control over, or is in common control with them.

10.     "Barnes & Noble" means Barnes & Noble, Inc., its parents, subsidiaries, affiliates, partners, directors, shareholders, officers, employees, agents, assigns or any predecessors or successors in interest, or any person or entity over which Barnes & Noble, Inc. exercises control, or who exercises control over, or is in common control with them.

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 21

11.     "Random House" means Random House, Inc., its parents, subsidiaries, affiliates, partners, directors, shareholders, officers, employees, agents, assigns or any predecessors or successors in interest, or any person or entity over which Random House, Inc. exercises control, or who exercises control over, or is in common control with them.

12.     "Investigation" means the DOJ's investigation of Apple and certain of the Publishers, whether before or after a formal investigation commenced, which resulted in the filing of the DOJ's civil lawsuit against Apple and certain of the Publishers, captioned, *United States of America v. Apple, Inc., et al.*, Case No. 12-cv-02826 (DLC) (S.D.N.Y. Apr. 11, 2012).

13.     "DOJ Litigation" means the lawsuit filed by the DOJ against Apple and certain of the Publishers captioned *United States of America v. Apple, Inc., et al.*, Case No. 12-cv-02826 (DLC) (S.D.N.Y. Apr. 11, 2012).

14.     "Class Action Litigation" means the lawsuit captioned *In re Electronic Books Antitrust Litigation*, Case No. 11-md-02293 (DLC) (S.D.N.Y.).

15.     "eBook" means any book sold to consumers in electronic form and read on a variety of electronic devices, including dedicated eReaders, multipurpose tablets, smartphones, and personal computers.

16.     "eReader" means any device on which eBooks can be purchased and/or read, including without limitation the Kindle, Nook, and iPad.

17.     "iPad" means Apple's tablet device, including all versions of the iPad hardware, including without limitation the iPad 2 and the new iPad.

18.     "Kindle" means Amazon's eReader device, including all versions of the Kindle hardware, including without limitation Kindle First Generation, Kindle 2, Kindle Keyboard, Kindle Touch, Kindle DX, and Kindle Fire.

19.     "Nook" means Barns & Noble's eReader device, including all versions of the Nook hardware, including without limitation Nook Simple Touch, Nook Color, and Nook Tablet.

20.     "Agency Model" means a distribution and sales model whereby the publishers could set retail prices by contract and retailers would act as the publishers' sales agents.

12

21. "Exclusive" means a contract provision that gives Amazon the sole right to sell and distribute eBooks published by Amazon's Kindle Digital Publishing (KDP).

22. "MFN" means most favored nation provision in a contract.

23. "Communicate" or "communication" refers to every manner or means of disclosure, transfer, or exchange of information orally or in writing.

24. "Document" is given the broadest possible meaning in accordance with Rule 34 of the Federal Rules of Civil Procedure, and is meant to include, at least, all writings as defined in Fed. R. Evid. 1001, correspondence, communications, notes, letters, memoranda, drawings, graphs, charts, photographs, discs, computer recordings, electronic mail, spreadsheets, databases, and any other data compilations from which information can be obtained.

25. For each request, You are to produce entire documents including all attachments, enclosures, cover letters, memoranda, and appendices. Copies that differ in any respect from an original (because, by way of example only, handwritten or printed notations have been added) are treated as separate documents and should be produced separately. A request for a document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, in addition to the document itself.

26. Documents stored in electronic form or format of any kind are to be produced in their original and native format, including all "metadata" or other electronic components of the information concerning or comprising such documents, and all pages should be Bates numbered.

27. If any document or thing requested was at one time in existence, but has been lost, discarded or destroyed, identify each such document or thing by date, type, and subject matter, describe the circumstances under which the document was lost, discarded or destroyed, and identify each person with knowledge of its subject matter and of the circumstances under which it was lost, discarded, or destroyed and, if the documents are destroyed, state the reason for such destruction.

28. If the production of any document requested herein is withheld on the ground of any claim of privilege or attorney work-product, please provide a statement detailing the claim of

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 23

privilege and all facts relied on to support that claim, including the document date, author(s), recipient(s), type (*e.g.*, memo, interview notes), subject matter, its present location, and all information required by the Federal Rules of Civil Procedure.

29.     If a portion of an otherwise responsive document contains information subject to a claim of privilege, those portions of the document subject to the claim of privilege shall be redacted from the document and the rest of the document shall be produced.  Information regarding the portion that is redacted must be included in the privilege log described in Paragraph 21 of the Definitions and Instructions.

30.     These requests cover all documents in Your possession, custody, or control.

31.     These requests are continuing in nature, and You must supplement Your responses pursuant to Federal Rule of Civil Procedure 26(e).

32.     Unless otherwise indicated, the timeframe for the requests is November 1, 2007 to the present.

DECLARATION OF MICHAEL E. KIPLING IN SUPPORT
OF MOTION TO QUASH OR MODIFY SUBPOENA
DUCES TECUM - 24

# Exhibit B

# In The Matter Of:

*UNITED STATES OF AMERICA, v*

*APPLE, INC., et al.,*

---

*June 22, 2012*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File C6M5appA.txt

**Min-U-Script® with Word Index**

1  violation requires a horizontal agreement.  I can't find that,
2  I don't believe, as a matter of law, and if we go to the rule
3  of reason test, again, I don't see how I'm going to make my
4  findings as a matter of law.
5        So, I think we are facing a trial and I think the
6  parties would be well-advised to forego summary judgment
7  practice here which is why I would urge your consideration --
8  careful consideration of my option 1, June 3 trial date.  But,
9  we will talk about that this afternoon and make a choice.  I
10 don't think we can or should have summary judgment practice --
11 and I'm sure no one would suggest this -- for the purpose of
12 delay.  There should be some utility in bringing summary
13 judgment motion.  I grant summary judgment motions.  I enjoy
14 working with summary judgment motions.  I consider them
15 carefully.  I'm happy to have summary judgment motions.  I
16 assure you that's not my point.  My point is in this case does
17 it make sense.
18       So, let's talk a little bit about the schedule.  One
19 of the other things you are going to notice, there are several
20 things that I did in the proposal here which is move up class
21 certification briefing.  If we are going to have not a class
22 going out because of the settlement in the state's action, I
23 think it would be lovely to be sending out notice at the same
24 time about the class so that if people are opting out they can
25 figure out what they're opting out of and so everybody, for

1  settlement purposes going forward, knows how big the class is,
2  what the state settlement covers.  That often drives further
3  negotiations in a lawsuit.  And we certainly need to know who
4  is in or who is out of the case in terms it of opt-outs before
5  we do the trial.  If we are going to have a June trial we have
6  to have early enough motion practice so the motion can be
7  resolved, notice can be sent out, people have a chance to opt
8  out and then you have a chance to crunch the numbers.
9        So, I think moving up class certification, the motion
10 practice makes a lot of sense here too.  And, of course, as we
11 have heard, there has been a reference to the need for the
12 states to figure out how to provide notice.  The class needs to
13 do that too.  There is no reason they couldn't share experts
14 and at least have a common approach if they don't share
15 experts.  I'm not quite sure what the defense to class
16 certification would be here.  I have denied class
17 certification, I just did it this week.  I'm not afraid of
18 doing that either in the appropriate case.  But I'm not sure I
19 see the arguments for denying class certification in this case.
20 Again, I'm happy to be educated but that's why I moved it up
21 front for all of these efficiencies.
22       And, I hope you saw right next to July 20th that I
23 have asked Judge Wood to assist the parties in settlement
24 discussions -- and she has very generously and graciously
25 agreed.  She has a lot of expertise in the field of antitrust.

1  She is an extraordinary jurist and I think we are all very
2  fortunate that she would be willing to assist the parties in
3  settlement discussions.  I know you took a variety of positions
4  about when you would be ready for such discussions but whether
5  or not you feel you are ready, I want you to enter into
6  discussions in good faith this fall at the latest.  She would
7  be ready to take your calls today if you wanted to set up
8  discussions to arrange some times to get together but I want
9  you to call her chambers no later than July 20th to arrange
10 settlement discussions for the fall.
11       I also made a judgment that a lot of expert discovery
12 was not dependent on concluding all fact discovery and that we
13 could run expert discovery concurrently, in part, with fact
14 discovery.  So, I hope you had a chance to think about that.
15 Some of the impressions that I have from your submissions that
16 have driven my proposal to you are the following:  We are
17 fortunate here that the Department of Justice documents are
18 being made available to all the parties so that that factual
19 record permits us to expedite discovery and have a 2013 trial.
20 I don't think we could have had a 2013 trial without that early
21 production of documents.  I think we would have been looking at
22 2014, at the earliest.
23       I am assuming that the plaintiffs will be proceeding
24 on both a per se theory and a rule of reason theory at trial
25 and that both will be charged to the jury no matter what their

1  verdict on one might be, and therefore that the discovery has
2  to be broad enough to encompass, including expert discovery,
3  both approaches.
4        I'm assuming that damages discovery can be concurrent
5  with liability discovery.  I think they're largely independent
6  of each other.  Again, I'm saying these things so that if my
7  perceptions are way off base you will have an opportunity to
8  tell me that and help me shape a different schedule for this
9  case.  If we are going to have summary judgment practice we
10 absolutely need time for the motions to be considered and
11 decided and for the parties to have the benefit of any opinion
12 before they prepare for trial.  So, it adds months to the
13 litigation.
14       So, I am at the point where we can start going through
15 your initial report and attachments B and C and addressing the
16 issues with specificity.  I will give you my rulings on each of
17 them and we can circle back and decide on schedule or we can
18 talk about a schedule first.  I'm not seeing any clear
19 indication from the parties which you prefer so let's go to the
20 initial report.
21       MR. FLOYD:  I am certainly prepared to discuss the
22 schedule.
23       THE COURT:  Counsel, if you could identify yourself.
24       MR. FLOYD:  I'm sorry.  Daniel Floyd, Gibson Dunn on
25 behalf of Apple.

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE ELECTRONIC BOOKS ANTITRUST )   No. 11-md-02293 (DLC)
LITIGATION )   ECF Case
_____ )

This Document Relates to:

_____
THE STATE OF TEXAS, et. al., )
                     )
      Plaintiffs, )   Civil Action No.
                     )
      v. )
                     )
HACHETTE BOOK GROUP, INC., et. al., )
                     )
      Defendants. )
                     )
_____ )

DECLARATION OF ABRAHAM L WICKELGREN, PH.D
REGARDING DAMAGES TO ELIGIBLE CONSUMERS
AND THE PROPOSED PLAN OF ALLOCATION

August 27, 2012

**Qualifications**

1. I am the Bernard J. Ward Centennial Professor of Law at the University of Texas at Austin School of Law and a Florence Rogatz Visiting Professor at Yale Law School. Prior to coming to Texas, I taught at the Duke and Northwestern law schools and in the economics department at Texas. From 1999-2004, I was a staff economist at the Federal Trade Commission. I have taught antitrust law since 2007.

2. I received an A.B. *cum laude* in applied mathematics/economics from Harvard University in 1991, a J.D. *magna cum laude* from Harvard Law School in 1994, and a Ph.D. in economics from Harvard University in 1999.

3. I have many publications in a variety of peer-reviewed economics journals on antitrust and industrial organization economics topics. I have many publications on the economics of settlement bargaining. A list of my publications is included in my curriculum vitae, which is attached to this declaration as Appendix D. I have also worked on numerous antitrust cases as an economist during my time at the Federal Trade Commission and as a consultant since that time.


**Assignment**

4. In this matter, Hachette, Harper Collins, and Simon & Schuster have been accused of engaging in a conspiracy, among themselves and others, to fix prices and otherwise restrain trade with regard to their actions surrounding the introduction of the agency model for e-books. I have been asked by the attorneys for the States of Texas, Connecticut, and Ohio (the "Liaison Counsel") to determine whether the settlement reached between the settling states and the settling publishers is fair, adequate and reasonable. I have further been asked to address whether the plan for the distribution of the settlement proceeds to consumers is fair, adequate and reasonable.


**Executive Summary**

5. My analysis demonstrates that the settlement amount of $69.04 [1] million is fair, adequate and reasonable. In coming to this conclusion, I conducted an analysis of e-book sales data that enabled me to estimate the overcharges that consumers paid as a result of the

---

[1] The original total amount of the three Settlement Agreements totaled $70.28 million. However, pursuant to the terms of the Agreements, a total of $1.24 million is credited back to the Settling Defendants because Minnesota chose not to join these settlements.

ι

participation of the three settling publishers in the conspiracy surrounding the introduction of the agency model. My analysis generated estimated total overcharges as well as estimated overcharges for three different categories of e-books, as explained in detail below. Comparing these calculations to the settlement proceeds, I find that the settlement amount is quite favorable to consumers.

6. I also reviewed the proposed plan for allocating the settlement proceeds to consumers. This plan distributes the proceeds in a manner that corresponds as accurately as possible to what each consumer could have expected to receive from litigation. It accounts both for the differences in the estimated overcharges across different categories of e-books and the differences in the litigation risks associated with the different categories of e-books. As a result, this allocation plan is fair, adequate, and reasonable.

## Data used in this Assessment

7. I used the following data to assess the reasonableness of the settlements between the states and the settling publishers. I reviewed complete, weekly retail sales data for all e-books sold by Amazon and Barnes & Noble from January 1, 2008 (before the introduction of the agency model on April 1, 2010) until February 2011. I also reviewed complete retail sales data from Apple's iBookstore from April 1, 2010 until February 2011. This data includes the weekly quantity sold and revenue for each e-book sold. By dividing the weekly revenue by the weekly quantity, I determined the average price each e-book was sold for during the week.

8. I received and reviewed complete, weekly sales data between March 2011 and early December 2011 from Amazon. Barnes & Noble and Apple did not provide data after February 2011.

9. I also reviewed data on the aggregate sales of e-books from Amazon and Barnes & Noble from April 1, 2010 until the end of the claims period, May 21, 2012. This data provides the total number of e-books sold and the total revenue received from the sale of e-books by each defendant publisher in each of three categories: New York Times Bestsellers, front-list e-books and back-list e-books.

10. For the purposes of my analysis, all sales of an e-book were included in the New York Times Bestseller category if the e-book was on the New York Times Bestseller list (fiction, non-fiction or advice) at any time between April 1, 2010 and the end of the claims period. Sales of an e-book were placed in the front-list category if the e-book was never on the New York Times Bestseller list between April 1, 2010 and the end of the claims period, and the sales took place within 12 months of the e-book's release. Sales of

2

an e-book were categorized as back-list if the e-book was never on the New York Times Bestseller list between April 1, 2010 and the end of the claims period, and the sales took place more than 12 months after the e-book's release.

11. Note that the sales of a given e-book could be categorized as front-list at some times and back-list at other times. If an e-book was ever on the New York Times Bestseller list, however, then all sales were categorized as New York Times Bestseller sales even if a particular sale took place before or after the e-book was on the bestseller list. This is the sales categorization method used in the aggregate data received from Amazon and Barnes & Noble.

## Methods used to Calculate Consumer Harm

12. Consumer loss from the conspiracy consists of two main components. First, consumers were harmed by paying higher prices for the e-books that they continued to purchase after the introduction of the agency model. Second, consumers were harmed by not buying (or buying fewer) e-books than they would have bought had e-book prices not increased because of the conspiracy.

13. I estimated the consumer loss from the first component, but not the second. To measure the second component of consumer loss would have required estimating how many e-books consumers would have bought at lower prices and how much value consumers lost as a result of forgoing those purchases. Such an estimate would have been difficult to generate with any degree of certainty based on the data I reviewed. The loss resulting from this second component would also almost certainly have been relatively small compared to losses incurred by paying higher prices.[2] Because this loss is almost certainly very small, calculating this amount was not necessary to my conclusions.

14. To estimate consumer loss from purchasing higher priced e-books, I determined the magnitude of the price increase caused by the introduction of the agency model and then multiplied this by the number of e-books that consumers purchased.

15. In order to provide a more precise estimate of the loss and to determine each publisher's contribution to that loss, I calculated both the estimated price increase and the quantity purchased separately by publisher and by the three categories of sales (New York Times Bestsellers, front-list, and back-list). To determine the magnitude of each these price

---

[2] The loss per e-book has to be strictly less than the amount of the price increase or else the consumer would have bought the e-book.

increases, I engaged in a "but for" or "counterfactual" analysis. As explained below, this involved estimating the e-book prices that would have prevailed in the market absent the conspiracy, the "but for" prices. I then compared these "but for" prices to the e-book prices that actually prevailed under the conspiracy.

16. Calculating the average price increase was complicated by the fact that e-books are not a homogenous product. Different e-books have different values to consumers and are priced differently as a result. Furthermore, the same e-book has a different value to consumers when it is first released as compared to its value later in its life-cycle. Thus, any comparison of the average price of e-books before and after the agency model would combine the effects of the agency model with the effects of a different composition of e-books at different stages of their life-cycle.

17. While this makes comparing the average e-book prices before and after the agency model an invalid measure for estimating the effect of the agency model for most e-books, the New York Times Bestsellers are an exception to this general rule. The reason is that in the pre-agency regime there was almost complete homogeneity in the pricing of New York Times Bestsellers. They were essentially all priced at $9.99 while they were on the New York Times Bestseller list. (My analysis of pre-agency pricing of New York Times Bestsellers based on the weekly sales data described above showed that the 10th percentile price was $9.99 and the 90th percentile price was $10.00.)

18. The "but for" analysis was complicated by the fact that the aggregate data classified an e-book as a New York Times Bestseller for all of its sales if the e-book was on the Bestseller list at any time after the introduction of the agency model. Thus, the appropriate "but for" price had to take into account how e-books that were on the New York Times Bestseller list were priced prior to being on the list and after coming off the list and the relative share of their sales that occurred in each period. Fortunately, my calculations showed that variation in pricing for these e-books prior to their being on the bestseller list and after they came off the bestseller list was small.[3] This lack of pricing variation suggested that there is very little potential error using the average price of New York Times Bestsellers prior to the introduction of the agency model.

19. Using this method, I calculated the "but for" price for New York Times Bestsellers to be $10.11 based on the average price of e-books in this category prior to the introduction of

---

[3] Appendix A provides more detail on this variation and my analysis showing why it was not significant.

4

the agency model.[4] Thus, I estimated the consumer loss for the New York Times Bestseller category of e-books as the average price of those e-books post-agency minus the average price of that category of e-books pre-agency ($10.11) times the total number of e-books sold in that category during the claims period.[5]

20. For e-books that were not New York Times Bestsellers, there was no uniform pricing policy during the pre-agency period. Because of that, I used the following approach to estimate the price increases for non-New York Times Bestsellers. For every e-book that had sales in the four week period before the introduction of the agency model and in the four week period afterwards, I calculated the average sales price of that e-book in both periods.[6] The difference between the post-agency average price and the pre-agency average price represented the agency price increase for a given e-book. I then calculated a weighted average of this price increase with the weights based on the unit sales of each e-book in the post-agency window. This was done separately for each publisher and separately for front- and back-list e-books. This produced an estimated average price increase, by publisher, for front-list and back-list e-books.

21. This approach to estimating the price increase due to the agency model was reliable because it compared before and after prices for the same (or very similar) products. Because the window used (four weeks on each side of the introduction of the agency model) was fairly narrow, the value of a given e-book to consumers was likely to be similar in both periods.[7] Therefore, it is reasonable to attribute any difference in price to the introduction of the agency model.

22. The four week window method of estimating the price effects provided a reasonable estimate of how the conspiracy affected e-book prices. By ensuring that I compared the prices of the same products, I generated a relatively unbiased estimate of the price effect due to the agency model.

---

[4] This average was $10.11 rather than $9.99 because e-books in this category sold at a slightly higher average price when not on the New York Times Bestseller list than they did when they were on the list.

[5] I calculated the post-agency average prices individually for each publisher in order to allocate the consumer over-charges appropriately across publishers. Because there was so much homogeneity in the pricing of New York Times Bestsellers pre-agency, there was no reason to separately calculate the pre-agency average prices for each publisher.

[6] I also calculated prices using a window of three weeks before and after the introduction of the agency model. Because the results were quite similar, I based my estimates on the longer, four week window.

[7] For example, consider an e-book that was newly released three weeks before the introduction of the agency model. The pre-agency price would be the average of its prices in its first, second, and third week after its release. Its post-agency price would be the average of its prices during its fourth, fifth, sixth, and seventh weeks after its release. Absent a change in pricing policy, the price of an e-book during this period is unlikely to change dramatically.

23. To calculate the quantity of e-books sold under the agency model during the claim period, I reviewed data from Barnes & Noble and Amazon showing the total quantity of e-books they sold in each of the three categories and for each of the three settling publishers during the period from April 1, 2010 through May 21, 2012. Since I did not review aggregate data from any other retailers, I estimated the total number of e-books sold during the claims period by all retailers based on an estimate of the combined market share of Amazon and Barnes & Noble.

24. I estimated unit market share in two ways. Further details regarding these methods are set forth in Appendix B. Together, these market share data suggest that 85 percent is a reasonable figure for the combined market share of Amazon and Barnes & Noble during the agency model period. Thus, I estimated total e-book sales by all retailers by dividing the units sold by Barnes & Noble and Amazon by 0.85. This resulted in an estimate of approximately 83.8 million e-books across the three settling publishers for all three categories of e-books.

**Estimated Damages and the Reasonableness of the Settlement Agreement**

25. Using the methods described above, I estimated the consumer overcharges in the settling jurisdictions from the sales of e-books by the three settling publishers for each of the three categories of e-books during the claims period. I estimated the total consumer overcharges to be approximately $135.79 million. This is the sum of estimated consumer overcharges for each of the three categories:
    a. New York Times Bestsellers--$38.66 million;
    b. Front-list--$27.73 million;
    c. Back-list--$69.40 million.

26. These unadjusted estimates, however, do not provide a reasonable point of comparison for the settlement amount because these estimates do not take into account any discount for litigation risks. While the states' case is quite strong, no case is without litigation risk. These litigation risks are especially significant given the unpredictability of antitrust litigation.

27. Thus, a fair, adequate and reasonable settlement will reflect a discount from the estimated consumer loss based on the fact that the settlement gives consumers a certain recovery whereas consumers run a substantial risk of receiving nothing if the publishers were to win at trial.

28. The appropriate discount to be taken for each class of e-book varies with the difficulty of proving the case. Based on discussions with Liaison Counsel, it is my understanding that

6

the case is strong for New York Times Bestsellers, slightly less strong for the non-NYT bestseller front-list e-books and least strong for the non-NYT Bestseller back-list e-books. Drawing heavily from discussions with Liaison Counsel, I assigned a percentage range of risk consistent with this evaluation for each of these three components of sales. For NYT Bestsellers, I assigned a percentage range of recovery of between 85 percent and 60 percent. For non-NYT front-list e-books, I assigned a percentage range of recovery of between 75 percent and 50 percent. For non-NYT backlist e-books, I assigned a percentage range of recovery of between 50 percent and 25 percent. When these percentage ranges are applied, the maximum expected recovery would be $88.36 million; the minimum expected recovery would be $54.41 million. The midpoint between these maximum and minimum expected recovery estimates is $71.385 million. The States' recovery is $69.04 million, which is close to the midpoint in the range of expected recovery. This supports my conclusion that the settlement is fair, adequate, and reasonable.[8]

29. This recovery is even more favorable considering that most economic models of settlement bargaining predict that a plaintiff in a case like this would be unable to obtain even the full expected value of its case (that is, the value discounted for litigation risk) due to the fact that the defendant may have some information that the plaintiff does not (even after discovery) and because it is the plaintiff that has to make the final decision about whether to file suit or accept a settlement.[9]

30. Additionally, the monetary recovery for consumers does not fully capture the true measure of the consumer benefit from this settlement. The settlement also includes an injunction against future conduct of the type that caused the increase in consumer prices, with the attendant benefit of restored competition in the e-book market. Consumers will realize the benefit of this injunction upon its entry, which could be substantially earlier than resolution of this matter against non-settling parties.

**Consumer Allocation Methodology**

31. Counsel has instructed me that while the settlements are with only three of the five publishers that participated in the agency model conspiracy, consumers of e-books from

---

[8] Note that the level and rank ordering of risk reflects the information available at the time of settlement. Further discovery in ongoing litigation against the non-settling Defendants could change the perceptions of success probability associated with each type of e-book.

[9] See, for example, Warren Schwartz and Abraham L. Wickelgren, *Advantage Defendant: Why Sinking Litigation Costs Makes Negative Expected Value Defenses, but not Negative Expected Value Suits Credible*, 38 Journal of Legal Studies 235-253 (2009)

all five publishers will receive compensation. In this section, I evaluate whether the States' Plan of Distribution is fair, adequate and reasonable and provides an appropriate method to calculate the recoveries for each category of e-book to assist this process.

32. In aggregating each consumer's total compensation from her individual e-book purchases, I weighted each category by discounting New York Times Bestsellers by 25 percent, discounting front-list e-books by 40 percent, and discounting back-list e-books by 67 percent. As discussed above, I used these weights because the litigation risk differs across categories. As part of the damages analysis described above, I estimated price increases from the conspiracy separately for each of the five publishers and separately for New York Times Bestsellers and front-list and back-list titles. These price increases will serve as the baseline for determining how much each consumer should receive.

33. Once I determined the weighted estimated overcharges for each category of e-books, I calculated a baseline monetary compensation amount. It was then necessary to convert this monetary recovery per consumer into a percentage of the total consumer settlement amount. Calculating this percentage for every consumer will enable the States to award each consumer this percentage of the total amount of the current settlement. For more details on this procedure, see Appendix C.

34. As Appendix C describes in detail, this approach yields the following compensation amounts per e-book for each e-book category:

    a. New York Times Bestseller--$1.32

    b. Front-list e-book--$0.36

    c. Back-list e-book--$0.25

35. It is important not to run the risk of exhausting the settlement pool before all consumers have been compensated. Thus, these compensation figures were designed to only exhaust approximately 95 percent of the settlement pool. Then, after all claims are filed, any unallocated settlement proceeds can be allocated, pro-rata, to the filing consumers.

36. Counsel has informed me that it may not be technologically feasible to compensate consumers differently for front-list and back-list e-books. If that is the case, then one can use a similar methodology to calculate the compensable overcharge for a combined category of non-New York Times Bestsellers. The compensable overcharge for this combined category would be $0.30 per e-book.[10]

---

[10] This figure more closely approximates the back-list compensation amount because there were many more back-lists sales than front-list sales in the data I reviewed.

8

## Conclusions

37. I have reviewed the proposed settlement agreements between the states and the three settling publishers and believe them to be fair, adequate, and reasonable. I also believe the proposed method of allocating the settlement amount across consumers is fair, adequate, and reasonable.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2012

Abraham L. Wickelgren